UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRETT BERKOWITZ, TREVOR )
BERKOWITZ, and AARON )
BERKOWITZ, )
 )
    Petitioners, )
 )
v. ) Civil Action No. 17-148
 )
REPUBLIC OF COSTA RICA, )
 )
    Respondent. )

**MEMORANDUM OPINION**
January 20, 2018 [Dkt. Nos. 1, 21, 22]

Petitioners, Brett Berkowitz and his sons, Trevor Berkowitz and Aaron Berkowitz (collectively referred to as "the Berkowitz claimants" or "petitioners"), seek vacatur or annulment of an interim award that was issued during international arbitration proceedings they filed against respondent, the Republic of Costa Rica ("Costa Rica" or "respondent"). In the underlying arbitration ("the Arbitration"), petitioners alleged that Costa Rica's decision to expropriate their beachside properties—and thus deprive them of their residential real estate property investments—violated the Dominican Republic-Central America Free Trade Agreement ("CAFTA").

After a five-day hearing, the Arbitration Tribunal ("the Tribunal") issued an interim award ("the Interim Award" or "the Award") on jurisdiction, finding that it: (1) lacked jurisdiction to hear claims with regard to one of petitioners' properties; (2) had jurisdiction to hear claims with respect to two of petitioners' properties; (3) and needed more briefing on whether it had jurisdiction to hear claims regarding petitioners' two

1

remaining properties. The Berkowitz claimants then filed a Petition to Vacate the Interim Award in this Court, pursuant to Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, on the ground that the Tribunal exceeded its authority in issuing the Award. While their Petition was pending in this Court, the Berkowitz claimants voluntarily withdrew their claims before the Tribunal.

The Berkowitz claimants' Petition is now fully briefed and ripe for my review. Upon consideration of the parties' submissions and the entire record herein, I find that the Berkowitz claimants' Petition must be DENIED. This case accordingly will be DISMISSED with prejudice.

## BACKGROUND

Before delving into the dispute at issue in the Arbitration, I must provide a brief background on the land disputes that formed the basis of petitioners' claims against Costa Rica.

### A. The Marine Park

In the early 1990s, the government of Costa Rica became increasingly concerned that tourist development near the country's beaches would seriously affect the nesting of leatherback turtles in that area. *See* Pet. to Vacate Arbitration Award Ex. K ("Interim Award") [Dkt. #1-11] ¶ 33. To reduce the impact of tourism on the leatherback turtles, Costa Rica decided to establish a marine park in order to protect the turtles, as well as other species and natural resources. *Id.* On July 9, 1991, the Ministry of Natural Resources, Energy and Mines accordingly issued an executive decree ("the 1991 Decree"), declaring the government's intent to establish a park to be known as Parque

Nacional Marino Las Baulas de Guanacaste ("the Park"), which translates to National Leatherback Turtle Marine Park of Guanacaste. *Id.* at ¶¶ 33, 60. The 1991 Decree stipulated the exact boundaries of the park, and as relevant here, called for "a strip of land of 75 meters from the public zone," which consists of the first 50 meters of land running inland from the mean high tide line. *Id.* at ¶¶ 33, 34. This decree essentially established a marine park that extended 125 meters inland from the high tide mark. *Id.* at ¶ 33.

Four years later, on July 10, 1995, the Costa Rican Congress passed Law No. 7524 ("the Park Law"), which authorized the state to acquire, either through direct purchase or expropriation, any private properties or portions thereof that are located within the boundaries of the Park. *See id.* at ¶ 36. Importantly, however, the Park Law established the eastern boundary of the Park at 125 meters *west* of the mean high tide mark, rather than 125 meters *east* of the mean high tide mark, as contemplated by the 1991 Decree. *Id.* at ¶¶ 36–37. In essence, the Park law created an offshore marine park. *Id.* The conflict between the 1991 Decree's contemplated inland marine park and the Park Law's offshore park generated uncertainty regarding the boundaries of the Park. *Id.* at 37.

## B. The Berkowitz Acquisitions

In 2003, Brett Berkowitz began to purchase land along the Pacific coast of Costa Rica, hoping to build luxury homes on that land in the future. *See* Pet. to Vacate Arbitration Award, Ex. D. ("Notice of Arbitration") [Dkt. #1-4] ¶ 43; Interim Award ¶ 60. Before purchasing the land, Brett Berkowitz alleges that he met personally with the Minister of the Environment and Energy, Carlos Manuel Rodriquez Echandi ("Echandi"), and received assurances that he would be permitted to develop this real estate, even

3

though large portions of it fell within the boundary set by the 1991 Decree—but not within the boundary set by the Park Law. Interim Award ¶ 60. According to petitioners, Echandi stated "that the Government did not intend to expropriate the land in question, they did not have the funds for it, and the Government and his Ministry did not intend to prevent development of the private property bordering the public zone . . . ." *Id.* Brett Berkowitz ultimately acquired five of the lots at issue in the Arbitration: Lots B1[1], B3, B5, B6, and B8[2] ("the Berkowitz Lots").[3] *See id.* ¶ 254, Table 38.

But in 2005, the Costa Rican government adopted Resolution No. 2238-2005-SETENA, which set the Park's eastern boundary 125 meters *inland* from the mean high tide mark. *Id.* at ¶ 41(i). Later that year, Costa Rica began initiating local court proceedings to expropriate lots that the government deemed to be located within the Park, including some of the lots owned by petitioners. *See* Pet. to Vacate Arbitration Award ("Pet'rs' Pet.") [Dkt. #1] ¶ 18.

## C. The Arbitration

The Berkowitz claimants, and five other individuals and entities whose properties were the subjects of these expropriation proceedings, submitted their claims to the International Centre for Settlement of Investment Disputes ("the Tribunal"), an international arbitration tribunal, alleging violations of Chapter Ten of CAFTA. *See*

---

[1] The Tribunal referred to the lots at issue by combining the first letter of the last name of the claimant and a number. For clarity's sake, I do the same. Interim Award ¶ 5 n.7.
[2] In 2013, Brett Berkowitz gave Lots B1 and B8 to his sons, Trevor Berkowitz and Aaron Berkowitz. *See id.* at ¶ 5 Table 1.
[3] Brett Berkowitz also purchased Lots B2 and B4 in September of 2003, but these lots were subsequently sold to third parties and were not at issue in the Arbitration. *See* Notice of Arbitration ¶ 43 n.49. Similarly, Brett Berkowitz sold Lot B7 to another private individual in 2004, and thus that lot also did not feature in the Arbitration. *See* Interim Award ¶ 5 Table 1.

Notice of Arbitration ¶¶ 1–3. In particular, they alleged that Costa Rica failed "to provide prompt and adequate compensation for its *de facto* and *de jure* takings," contrary to CAFTA Article 10.7. *Id.* at ¶¶ 17, 14. They also contended that Costa Rica failed to provide "access to the necessary administrative and/or judicial means for the prompt review of its *de facto* expropriation of certain segments of the lots" in question, in violation of CAFTA Article 10.5's minimum standard of treatment requirement. *Id.*

Costa Rica objected to the Tribunal's jurisdiction on the grounds that the claims fell outside of CAFTA's three-year limitation period, and that the alleged breaches occurred before CAFTA entered into force between Costa Rica and the United States on January 1, 2009. *See* Interim Award ¶ 109. On the merits, Costa Rica argued that the petitioners "were, or should have been, aware that their properties, or portions of them, were subject to expropriation, as provided by the law creating the Park," and that, to the extent that any property has been expropriated, "[it was] not . . . an uncompensated expropriation." *Id.* at ¶ 8.

### D. The Interim Award

On October 25, 2016, the Tribunal issued an Interim Award regarding its jurisdiction over petitioners' claims. *Id.* at p. i. In the Award, the Tribunal first noted that CAFTA imposed two temporal limitations on the Tribunal's jurisdiction to hear a claim. *See id.* at ¶ 237. First, Article 10.3 of CAFTA holds that its provisions do not bind Costa Rica "to any act or fact that took place or any situation that ceased to exist before" Costa Rica implemented the agreement on January 1, 2009. *See* CAFTA, art. 10.1.3, 19 U.S.C. §§ 4001, 4011. Second, CAFTA makes clear that "[n]o claim may be

submitted to arbitration . . . if more than three years have elapsed from the date on which the claimant first acquired, or should have first acquired, knowledge of the breach alleged . . . and knowledge that the claimant . . . has incurred loss or damage." *See id.* at art. 10.18.1. The Tribunal then proceeded to assess petitioners' claims with these limitations periods in mind.

The Tribunal first determined that the Berkowitz claimants had constructive knowledge of the expropriation of their lots as of November 27, 2006. Interim Award ¶¶ 96(c), 265. As a result, the Tribunal concluded that it lacked jurisdiction to hear any of petitioners' expropriation claims under CAFTA Article 10.7 because the alleged expropriations occurred *before* the effective date of CAFTA, and because petitioners knew about the alleged breach over three years before they sought arbitration. *Id.* at ¶¶ 265–268. The Tribunal went on to conclude, however, that even if petitioners could not pursue claims under CAFTA Article 10.7 for expropriation, they could pursue claims under CAFTA Article 10.5 for violations of the minimum standard of treatment, provided that the Costa Rican judgment assessing compensation for their expropriated property was entered within the limitations period and there was evidence that the judgment was made with "manifest arbitrariness and / or . . . blatant unfairness." *Id.* at ¶ 286. Thus, because Costa Rica entered judgments with respect to Lots B3 and B8 in 2013 and 2012, respectively, which were both prior to the commencement of arbitration but within the limitations period, the Tribunal concluded that the Berkowitz claimants could pursue claims under CAFTA Article 10.5 for those properties. *Id.* at ¶ 286, Tables 10, 13. Judgments assessing compensation for Lots B5 and B6, however, were rendered *after*

6

Arbitration commenced, so the Tribunal sought more argument on whether it had jurisdiction to hear Article 10.5 claims regarding those Lots. *Id.* at ¶¶ 289–95. Finally, the Tribunal determined that it did not have jurisdiction over Lot B1 because neither party provided evidence showing that a judgment on compensation for that lot had ever occurred. *Id.* at ¶¶ 274, 288.

### E. Subsequent Proceedings

Because of the "heavy factual detail of th[e] case," after the Tribunal issued the Interim Award, it invited the parties to propose corrections within 30 days, as provided for in Article 38 of the United Nations Commission on International Trade Law Arbitration Rules ("the UNCITRAL Arbitration Rules"), G.A. Res. 68/109, art. 38, U.N. Doc. A/RES/68/109 (Dec. 16, 2013). *See* MacGrath Decl. Ex. D [Dkt. #23-5] 1–2. Although the parties knew that—contrary to the Tribunal's finding—a judgment on compensation for Lot B1 had, in fact, occurred, they did not supplement the record with evidence reflecting that fact within the 30-day period. Instead, petitioners represented to the Tribunal that they "ha[d] not identified any errors . . . to which they wish[ed] to draw the Tribunal's attention." Third MacGrath Decl. Ex. B [Dkt. #28-3] 1.

But on January 23, 2017, the Berkowitz claimants filed their Petition in this Court, seeking to vacate or set aside the Interim Award. *See* Pet'rs' Pet. On March 20, 2017, while the Berkowitz claimants' Petition was pending before this Court, the Tribunal contacted the parties, noting that it had become aware of the B1 judgment, even though the parties had not disclosed the judgment within the 30-day period following the issuance of the Award provided for by Article 38 of the UNCITRAL Arbitration Rules.

*See* Third MacGrath Decl. Ex. A [Dkt. #28-2] 1. Importantly, the Tribunal noted that, although it had "reached a decision on the question of its jurisdiction regarding Lot B1 in its Interim Award, it remain[ed] seised of the dispute between the Parties," and was "not *functus officio.*" *Id.* at 2. The Tribunal accordingly asked the parties to submit the B1 Judgment, which Costa Rica did on April 4, 2017. *See id.*; Third MacGrath Decl. Ex. C [Dkt. #28-4] 1–2. After reviewing the B1 Judgment, the Tribunal notified the parties that it needed to correct the Interim Award. *Id.* The Berkowitz claimants opposed any correction of the Interim Award on the ground that it contained legal and factual errors, and they moved for a preliminary injunction in this Court to enjoin the Tribunal from correcting the Award. *See* Mot. for Prelim. Inj. [Dkt. #27]. Shortly thereafter, the Berkowitz claimants filed a notice with the Tribunal indicating their voluntary withdrawal of their claims. *See* Fourth MacGrath Decl. Ex. D [Dkt. #29-5] 1–3.

On May 30, 2017, the Tribunal issued a Corrected Interim Award ("the Corrected Award") and a Procedural Order terminating the Arbitration ("the Procedural Order"). *See* Fourth MacGrath Decl. Ex. A ("Corrected Award") [Dkt. #29-2]; Fourth MacGrath Decl. Ex. B ("Procedural Order") [Dkt. #29-3]. The Corrected Award made clear that, in light of the B1 judgment, the Tribunal would consider arguments from petitioners regarding whether the Tribunal has jurisdiction to hear Article 10.5 claims with respect to that property. *See* Corrected Award ¶ 308(3), Table 9. But because the Berkowitz claimants voluntarily withdrew their claims, the Tribunal terminated the Arbitration. *See* Procedural Order ¶ 39. The issuance of the Corrected Award mooted petitioners' motion for a preliminary injunction. *See* Notice of Withdrawal of Mot. [Dkt. #30].

8

# DISCUSSION

## A. Default Judgment

Before turning to the merits of this dispute, I must first address one procedural hurdle that both parties have raised: whether Costa Rica defaulted by allegedly failing to timely reply to the Petition. The Berkowitz claimants filed their Petition in this Court on January 23, 2017, pursuant to Section 10 of the FAA, 9 U.S.C. § 10. In an attempt to serve Costa Rica, petitioners delivered a copy of their Petition to the Washington, D.C. office of Sidley Austin LLP ("Sidley"), which is the law firm that represented Costa Rica in the underlying Arbitration. *See* Smith Aff. [Dkt. #13-1] 1. Although Sidley currently represents Costa Rica in this case, at the time that petitioners served Sidley, Costa Rica had not retained the law firm to represent it. *Id.* On February 2, 2017, Sidley sent the Berkowitz claimants a letter explaining that the firm was not authorized to accept service on behalf of Costa Rica. *See* Letter, February 2, 2017 [Dkt. #22-2].

In another attempt to effect service, petitioners delivered a copy of the Petition in this case to the Costa Rican Ministry of Foreign Trade and the Embassy of Costa Rica in Washington, D.C on January 25, 2017. *See* Smith Aff. 1. Under the Hague Service Convention, however, Costa Rica specifically designated the Ministry of Foreign Affairs and Worship as the authority designated to receive foreign judicial documents. *See Broad v. Mannesmann Anlagenbau AG*, 196 F.3d 1075, 1076 (9th Cir. 1999) ("The Hague [Service] Convention requires plaintiffs who sue foreign defendants in signatory countries to request that a designated central authority execute service of process."); *Costa Rica – Central Authority & practical information*, HAGUE CONFERENCE ON PRIVATE INT'L

9

Law: Hague Convention on the Service Abroad of Judicial & Extrajudicial Documents in Civil & Commercial Matters, Nov. 15, 1965 (designating the Ministry of Foreign Affairs and Worship as Costa Rica's central authority).[4] Thus, this attempt, too, failed to effect service.

After these unsuccessful attempts to serve Costa Rica, the Berkowitz claimants moved for this Court to issue a summons to the Ministry of Foreign Affairs and Worship, which I granted on February 3, 2017. *See* 2/3/17 Dkt. Entry. Petitioners then mailed their Request for Service Abroad of Judicial Documents to the Ministry of Foreign Affairs and Worship on February 22, 2017. *See* Aff. of Additional Serv. ¶ 2 [Dkt. #16-1]. Costa Rica accepted service on March 28, 2017. *See* Cert. of Serv. [Dkt. #19-1].

The following week, the Berkowitz claimants submitted to this Court an affidavit for default, claiming that Costa Rica had been served either on January 23, 2017 or on January 25, 2017. *See* Smith Aff. 1. They further alleged that Costa Rica had defaulted by failing to respond to the Petition within 14 days of service. *Id.* at 2. Accordingly, the Clerk of Court entered default against Costa Rica on April 6, 2017. Clerk's Entry of Default [Dkt. #15]. The very next day, Costa Rica entered an appearance in this case and informed the Court that it was not served with the Petition until March 28, 2017. *See* Notice of Intent to Seek Vacatur of Default [Dkt. #19]. Costa Rica also made clear its intention to timely submit a response to the Petition by May 30, 2017. *Id.* at 2.

On April 20, 2017, petitioners moved for default judgment against Costa Rica,

---

[4] This authority is available at https://www.hcch.net/en/states/authorities/details3/?aid=1068.

10

pursuant to Federal Rule of Civil Procedure 55. *See* Mot. for Default J. [Dkt. #21]. In their motion, the Berkowitz claimants argue that they effected service on January 25, 2017, by hand delivering a copy of their Petition to the address listed for notices under CAFTA-DR, § B, ¶ 10. *Id.* at 6. Because Costa Rica did not timely respond, petitioners insist that default judgment must be entered against Costa Rica. *Id.* at 7–8.

That same day, Costa Rica filed a Motion to Vacate the Entry of Default pursuant to Federal Rule of Civil Procedure 55(c), arguing that the Foreign Sovereign Immunities Act ("FSIA") provides a respondent with 60 days after service of process to respond to a petition. *See* Mot. to Vacate Entry of Default [Dkt. #22-1] 5; 28 U.S.C. § 1608(d). According to Costa Rica, petitioners did not serve the Republic until March 28, 2017, and thus the 60-day period had not yet expired. *See* Mot. to Vacate Entry of Default 6. Both motions are now ripe. Upon review of the motions and the accompanying documents, I find that Costa Rica was not properly served until March 28, 2017.

Pursuant to the FSIA, a foreign state is entitled to 60 days after the completion of proper service to respond to a petition filed in U.S. court. *See* 28 U.S.C. § 1608(d) ("[A] foreign state . . . shall . . . respon[d] . . . within sixty days after service has been made under this section."); *see also Keegel v. Key West & Caribbean Trading Co., Inc.*, 627 F.2d 373, 374 (D.C. Cir. 1980) ("No obligation to [respond] ar[ises] until after service [is] effected."). The relevant issue, then, is when petitioners properly effected service upon Costa Rica.

The Berkowitz claimants argue that they were not required to comply with the FSIA because they properly served Costa Rica pursuant to Section 12 of the FAA. Mot.

11

for Default J. 9. But the Supreme Court has made clear that the "FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). And "[S]ection 1608(a) [of the FSIA] sets forth the exclusive procedures for service" on a foreign state. *Transaero, Inc. v. La Fuerza Aerea Bolilviana*, 30 F.3d 148, 154 (D.C. Cir. 1994) (internal quotation marks omitted). Thus, service on Sidley and the Costa Rican Embassy pursuant to the FAA did not qualify as effective service for the purposes of calculating the 60-day limitations period. *See id.* at 153–54 (holding that service was ineffective where plaintiff served a foreign state's "Ambassador and Consul General in Washington, and . . . First Minister . . . but never the Ministry of Foreign Affairs or the Secretary of State").

Alternatively, the Berkowitz claimants allege that, even if service upon Sidley and the Embassy was improper, they served Costa Rica on January 25, 2017 by delivering the Petition to the Ministry of Foreign Trade pursuant to Annex G of Chapter 10 of CAFTA. Mot. for Default J. 12–13. Annex G lists the designated recipients of service and their addresses for the seven member states of CAFTA. *See* CAFTA-DR, Ch. 10, § B, Annex G. As to Costa Rica, Annex G identifies the Ministry of Foreign Trade as the designated recipient of service. *Id.* And under Section 1608(a)(1) of the FSIA, a plaintiff may serve a foreign state in federal court "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the [Petitioner] and the foreign state." 28 U.S.C. § 1608(a)(1). The Berkowitz claimants accordingly argue that Annex G of Chapter 10 of CAFTA constitutes a "special arrangement" under Section 1608, such that they properly effected service by delivering documents to the Ministry of

12

Foreign Trade. Resp. in Opp'n to Mot. to Vacate Entry of Default [Dkt. #24] 12. Unfortunately for petitioners, this too, proved to be ineffective service.

Courts have interpreted the "special arrangement" language of Section 1608 narrowly, such that a special arrangement exists only where the language is "all encompassing" rather than "confined to the contract or agreement at issue." *Orange Middle E. & Africa v. Republic of Equatorial Guinea*, No. 15-CV-849 (RMC), 2016 WL 2894857, at *4 (D.D.C. May 18, 2016). The plain text of Annex G makes clear that it does not apply to *all* attempts to serve Costa Rica in *any* matter; instead, it is limited to communications made pursuant to the dispute settlement section of Chapter 10 of CAFTA. As relevant here, Annex G expressly provides that "[n]otices and other documents in disputes under [Chapter 10] Section B shall be served on" the Foreign Trade Ministry. *See* CAFTA, Ch. 10, § B, Annex G. And section B of Chapter 10 sets forth the dispute settlement provisions for investor-state arbitrations under CAFTA. *See id.*, Ch. 10, § B. As such, Annex G plainly is not an "all encompassing" provision that governs all communications between a claimant and a CAFTA member state. Instead, Annex G covers communications between a claimant and a CAFTA member state regarding arbitration disputes under the treaty. Annex G *does not* apply to the service of judicial documents in subsequent vacatur proceedings in United States domestic courts. *See, e.g., Orange Middle E.* 2016 WL 2894857, at *5 ("[T]he Agreement provided for dispute resolution through . . . binding arbitration[, which was] the outer limit of the [Agreement's] reach. A Petition to [confirm] the ensuing arbitral award is another matter—one that must . . . conform to FSIA's prerequisites to jurisdiction in this Court.").

For these reasons, I find that petitioners' attempt to serve Costa Rica pursuant to Annex G was ineffective, and thus Costa Rica was not properly served until March 28, 2017. As such, Costa Rica's response to the Berkowitz claimants' Petition in this case was timely filed, and Costa Rica is accordingly not in default. I therefore vacate the Clerk's entry of default and proceed to the substance of the Petition.

**B. Petition to Vacate the Interim Award**

The Berkowitz claimants ask this Court to set aside the Tribunal's Interim Award pursuant to Section 10 of the FAA, 9 U.S.C. § 10, on the ground that the Award exceeded the authority granted to the Tribunal by the parties. Pet'rs' Pet. 1. Costa Rica counters that this Court does not have jurisdiction to review the Interim Award because it was not final. Resp't's Opp'n 14. For the following reasons, I find that Costa Rica is correct.

In general, it is improper for a district court to interfere with an international arbitration proceeding before the tribunal issues a final ruling. *See Am. Postal Workers Union v. U.S. Postal Serv.*, 422 F. Supp. 2d 240, 246 (D.D.C. 2006) ("[O]rdinarily, an arbitration award must be final and binding before a district court may vacate or enforce it."). Indeed, "[t]he Arbitration Act contemplates that courts should not interfere with arbitrations by making interlocutory rulings." *LaPrade v. Kidder Peabody & Co., Inc.*, 146 F.3d 899, 903 (D.C. Cir. 1998). And our Circuit has held that "it is a cardinal principle of arbitration that [arbitration] awards are reviewable and enforceable only if they are 'final'—that is, if they purport to resolve all aspects of the dispute being arbitrated." *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3090 v. Fed. Labor Relations Auth.*, 777 F.2d 751, 755 (D.C. Cir. 1985) (citing *Michaels v. Mariforum Shipping, S.A.*,

624 F.2d 411, 413–14 (2d Cir. 1980)). Other Circuits to address the issue have similarly held that the Federal Arbitration Act precludes the interlocutory review of arbitration decisions. *See, e.g., Michaels*, 624 F.2d at 414 ("Under the [FAA] . . . a district court does not have the power to review an interlocutory ruling by an arbitration panel."); *Schatt v. Aventura Limousine & Transp. Serv., Inc.*, 603 Fed. App'x 881, 887 (11th Cir. 2015) ("[T]he FAA allows review of final arbitral awards only, but not of interim or partial rulings."); *Quixtar, Inc. v. Brady*, 328 Fed. App'x 317, 320 (6th Cir. 2009) ("[C]ourts generally should not entertain interlocutory appeals from ongoing arbitration proceedings."); *Blue Cross Blue Shield of Mass, Inc. v. BCS Ins. Co.*, 671 F.3d 635, 638 (7th Cir. 2011) ("[J]udges must not intervene in pending arbitrations."). The question I must decide, then, is whether the Interim Award was final, and thus reviewable.

Under the "complete arbitration rule," for an arbitration to be final, "the arbitrators must have decided not only the issue of liability of a party on the claim, but also the issue of damages." *United Transp. Union v. Trailways, Inc.*, No. 86-CV-1502, 1987 WL 8730, at *1 (D.D.C. Mar. 12, 1987). Indeed, "[t]he courts seem to agree that, when 'a substantive task remain[s] for the arbitrator to perform,' an award is not final." *Am. Postal Workers Union*, 422 F. Supp. 3d at 246 (quoting *McKinney Restoration Co. v. Ill. Dist. Council No. 1*, 392 F.3d 867, 871 (7th Cir. 2004)). Importantly, the Tribunal's *subjective* beliefs about the finality of its award is a key factor in determining whether the award was, in fact, final. *See Am. Postal Workers Union*, 422 F. Supp. 2d at 246 (noting that an award will be considered final when it is "'intended by the arbitrator to be his complete determination of every issue submitted to him'" (quoting *McKinney Restoration*

15

Co., 392 F.3d at 871)). Thus, I must assess whether the evidence demonstrates that the Tribunal believed its "'assignment [was] completed.'" *Id.* (quoting *McKinney Restoration*, 392 F.3d at 872). Unfortunately for the Berkowitz claimants, the evidence in this case makes clear that the Tribunal did not so believe.

Indeed, by letter dated March 20, 2017—after the Berkowitz claimants' Petition had already been filed in this Court—the Tribunal noted that "[although] [it] reached a decision on the question of its jurisdiction regarding Lot B1 in its Interim Award, it remains seised of the dispute between the Parties. It is not *functus officio*." Letter, Mar. 20, 2017. In that same letter, the Tribunal requested that the parties submit "documents" concerning the Tribunal's jurisdiction over Lot B1. *Id.* This request for documents evidences the Tribunal's belief that there were still "substantive task[s]" remaining for it to perform. *See Am. Postal Workers Union*, 422 F. Supp. 3d at 246. Similarly, in the Tribunal's letter dated April 17, 2017, the Tribunal again noted that it "considers that it is not *functus officio*, being still seised of the dispute between the Parties." Letter, Apr. 17, 2017 [Dkt. #28-4]. And in the Procedural Order, the Tribunal stated:

> Although the Tribunal reached a decision on the question of its jurisdiction regarding Lot B1, it is not *functus officio* and remains seised of the matter. The decision of the Tribunal was expressly designated to be an "interim" award, not a "final" award. That Interim Award contemplated further proceedings involving all Claimants, including both the Berkowitz Claimants and Respondent. All parties thus remained subject to the arbitral jurisdiction of the Tribunal even after the Interim Award issued.

Procedural Order ¶ 35.

This order makes clear that the Tribunal considered itself to be "seised" of the dispute, which is not surprising, given that the Interim Award merely resolved some jurisdictional

16

issues, while expressly contemplating the Tribunal's intent to review additional evidence and assess the merits of the dispute at a later time.[5] *See* Interim Award ¶ 308.

Petitioners concede that the "Interim Award is not the ultimate, conclusive arbitral award on all claims submitted to arbitration," but they argue that the Interim Award was sufficiently final for this Court's review because it resolved claims as to Lots B1 and B8 and "most claims as to Lots B3, B5, and B6." Pet'rs' Pet. ¶ 42. But petitioners mischaracterize the nature of the Interim Award. In that Award, the Tribunal ruled that (1) it lacked jurisdiction to hear any claims with respect to Lot B1; (2) it had jurisdiction to hear claims relating to Lots B3 and B8 to the extent that petitioners alleged arbitrariness or unfairness under CAFTA Article 10.5; and (3) "the Parties should be afforded an opportunity to be heard" on whether the Tribunal has jurisdiction over judgments respecting Lots B5 and B6 that were rendered after June 10, 2013. Interim Award ¶ 308. The Interim Award also expressly contemplates "consultation with the Parties" regarding "further proceedings" to allow the Tribunal to decide these remaining issues. *Id.* Importantly, the Interim Award included no final rulings as to liability or

---

[5] In its Procedural Order, the Tribunal noted that the Berkowitz claimants decided "to withdraw their remaining claims," so it accordingly "order[ed] the termination of the proceeding with respect to the Berkowitz Claimants and their remaining Lots B1, B3, B5, B6, and B8." Procedural Order ¶ 46. Petitioners argue that the Tribunal's "termination of the arbitration proceedings weighs strongly in favor of reviewing the Interim Award in this Court." Reply in Supp. of Pet'rs' Pet. [Dkt. #31] 6. Petitioners take the position that the Tribunal's termination of proceedings—upon their request—rendered the Interim Award final. *Id.* But the fact that petitioners voluntarily withdrew their claims before the Tribunal—after filing their Petition for vacatur in this Court—does not transform the Interim Award into a final decision.
    This is especially true in light of the fact that the Corrected Award did not resolve any of the jurisdictional or merits issues still pending before the Tribunal at the time of petitioners' withdrawal of their claims. In fact, the only substantive change the Tribunal made in the Corrected Award was its finding that it *might* have jurisdiction to hear claims related to Lot B1. In this way, the Corrected Award rendered the Interim Award *less* final than it was at the time of Petitioners' filing for vacatur in this Court. At bottom, petitioners' argument on this point is nothing more than an attempt to evade the Tribunal's jurisdiction, and I find that it is unavailing.

damages, but instead principally addressed questions of the Tribunal's "jurisdiction and the justiciability of the Claimants' case under the CAFTA." *Id.* at ¶ 300. This language regarding "further proceedings" makes unequivocally clear the Tribunal's intent to adjudicate the merits of the parties' dispute upon its consideration of additional argument.

Therefore, because the evidence clearly demonstrates that the Tribunal did not believe that its "assignment [was] completed," *McKinney Restoration*, 392 F.3d at 872, I find that the Interim Award was not a final, appealable judgment.

## CONCLUSION

For the foregoing reasons, the Berkowitz claimants' Petition to Vacate the Interim Arbitration Award is DENIED, and petitioners' case is DISMISSED with prejudice. A separate Order consistent with this decision accompanies this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge